UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

№ 08-CV-2528 (JFB) (WDW)
_____

KALPANA SHAH,

Plaintiff,

VERSUS

ECLIPSYS CORPORATION,

Defendant.

_____

**MEMORANDUM AND ORDER**
July 7, 2010
_____

JOSEPH F. BIANCO, District Judge:

Plaintiff Kalpana Shah ("plaintiff" or "Shah") brings this action under the Americans with Disabilities Act and the Family and Medical Leave Act against Eclipsys Corporation ("Eclipsys" or "defendant"), her former employer. Plaintiff asserts that Eclipsys fired her in July 2007 because she was disabled and because she had recently requested medical leave. Eclipsys claims that it fired plaintiff because of her repeated insubordinate and disruptive behavior, culminating in a July 12, 2007 argument with her supervisor.

Eclipsys has moved for summary judgment and for sanctions. As set forth below, the Court grants the motion for summary judgment in its entirety. On the ADA claim, there is no evidence from which a trier of fact could rationally find either (1) that plaintiff is a "individual with a disability," or (2) that Eclipsys fired plaintiff because she was disabled. Similarly, on the FMLA claim, plaintiff has produced no evidence from which a rational jury could find that she was fired in retaliation for her leave request. With respect to Eclipsys's motion for sanctions, the Court reserves decision because it concludes that an evidentiary hearing is necessary.

I. MOTION FOR SUMMARY JUDGMENT

A. Background

1. Factual Background

The following facts are taken from the parties' depositions, declarations, exhibits, and respective Local Rule 56.1 statements of facts.[1] Upon consideration of a motion for summary judgment, the Court construes the facts in the light most favorable to the non-moving party. *See Capobianco v. City of N.Y.*, 422 F.3d 47, 50 n.1 (2d Cir. 2005). Accordingly, with regard to defendant's motion for summary judgment, the Court shall construe the facts in favor of plaintiff.

Defendant Eclipsys provides, among other things, information technology services to health care organizations. (*See* Def.'s ¶¶ 56.1 1-2.) In early 2005, Eclipsys began providing IT services to the North Shore Long Island Jewish Health System ("NSLIJ"). (*Id*. ¶ 7.)

In 2003, plaintiff began working for Perot Systems, the company that had provided IT services at NSLIJ before Eclipsys. When Eclipsys took over the NSLIJ contract, the Perot Systems employees who worked at NSLIJ were given the option of remaining with Eclipsys. A number of Perot Systems employees, including plaintiff; Stephen Domjan, plaintiff's direct supervisor; and another of her supervisors, Evelyn Franklin, decided to continue working at NSLIJ for Eclipsys. (*See id*. ¶¶ 7, 8, 10.)

Plaintiff received performance reviews from Eclipsys in April and October 2005. Both reviews indicated that plaintiff's supervisors felt that her performance was not

---

[1] The Court notes that the papers plaintiff filed in opposition to summary judgment did not comply with Local Civil Rule 56.1. Specifically, Local Rule 56.1 requires a party opposing summary judgment to respond to the Statement of Undisputed Facts filed by the moving party by submitting a document containing " correspondingly numbered paragraph[s] responding to each numbered paragraph in the statement of the moving party." Here, defendant submitted a 91-paragraph statement of undisputed material facts. Plaintiff's opposition, however, includes only ten paragraphs numbered one through ten, none of which directly correspond to any of the numbered paragraphs in defendant's statement. "Generally, a 'plaintiff['s] failure to respond or contest the facts set forth by the defendants in their Rule 56.1 statement as being undisputed constitutes an admission of those facts, and those facts are accepted as being undisputed.'" *Jessamy v. City of New Rochelle*, 292 F. Supp. 2d 498, 504 (S.D.N.Y. 2003) (quoting *NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.*, 262 F. Supp. 2d 134, 139 (S.D.N.Y. 2003)). However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (citations omitted); *see also Gilani v. GNOC Corp.*, No. 04 Civ. 2935(ILG), 2006 WL 1120602, at *2 (E.D.N.Y. Apr. 26, 2006) (exercising court's discretion to overlook the parties' failure to submit statements pursuant to Local Civil Rule 56.1). Accordingly, in the exercise of its broad discretion, the Court will overlook this defect and will deem admitted only those facts in defendant's Rule 56.1 statement that are supported by admissible evidence and not controverted by other admissible evidence in the record. *See Fed. Trade Comm'n v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283, 303 (S.D.N.Y. 2008) (overlooking party's failure to comply with Local Rule 56.1 and considering "'the totality of the parties' submissions in identifying disputed material facts'" (quoting *Hamilton v. Bally of Switz.*, No. 03 Civ. 5685, 2005 WL 1162450, at *9 (S.D.N.Y. May 12, 2005))). Thus, where defendant's Rule 56.1 statement is cited, the statement is supported by the record, and there is no evidence in the record to contradict that fact.

meeting expectations. The April 2005 review stated, for example, that "[t]he management team has spoken to [plaintiff] several times since Jan. 05 related to behavioral and performance expectations. Improvements in these areas must be demonstrated immediately and consistently." (Franklin Decl. Ex. 1.) Similarly, the "comments" portion of plaintiff's October 2005 review states, among other things, that "discussions" had taken place with plaintiff "regarding the areas of performance that need improvement, specifically teamwork, professionalism, security of confidential information, conducting personal business during work hours, and the need . . . to show initiative and be able to work more independently." (*Id.* ex. 2.) The comments section closed by stating that plaintiff "should understand her employment is at risk." (*Id.*; *see also* Def.'s 56.1 ¶¶ 17-21.)

Also during 2005, plaintiff twice took medical leave. The first leave occurred between May and August and was based on plaintiff's ulnar neuropathy. (Def.'s 56.1 ¶ 15.) When plaintiff requested leave, her supervisor, Evelyn Franklin, suggested she resign from her position. (Pl.'s 56.1 ¶ 1.) A contemporaneous e-mail sent by Franklin indicates the Franklin made the suggestion because she believed plaintiff's job performance was not meeting expectations. (*See* Pl.'s Ex. 1.)

The second occurred as a result of plaintiff experiencing a rapid heartbeat after viewing the October 2005 performance review described above. (*Id.* ¶¶ 22-23.) After this incident, plaintiff was granted approximately six weeks leave of absence for her rapid heartbeat and anxiety. (*Id.* ¶ 24.) During her second leave of absence, plaintiff filed a complaint against defendant with the New York State Division of Human Rights. In the complaint, plaintiff alleged that, when she first requested a disability leave, Franklin, her supervisor, "suggested that I resign and look for another job or be fired." Additionally, plaintiff alleged other incidents of verbal harassment and disparate treatment by her supervisors, such as, for example, not being allowed to work from home and being required to eat lunch at her desk. (Pl.'s Dep. Ex. 20.)[2]

Plaintiff continued to work for defendant throughout 2006. At her request, she received an Interim Performance Review in September of that year. (Def.'s 56.1 ¶ 50.) Although the review indicated that plaintiff had "shown some work changes toward positive improvements," it also stated that plaintiff had "been involved with three incidents where she has acted in a very inappropriate manner." (Gefter Decl. Ex 1.) One of these incidents occurred after plaintiff was spoken to about spending time socializing with a colleague instead of working. (*Id.*) According to the performance review, plaintiff responded by becoming very upset, claiming she was "'being unfairly treated,'" and stating "that this is 'the reason she has filed a court case.'" Furthermore, plaintiff told her supervisor that he could "'be in trouble too.'" (*Id.*) The second incident described in the report involved, among other things, plaintiff falsely accusing one of her supervisors of drinking alcohol at lunch. (*Id.*) Plaintiff now appears to contend that she was correct in accusing the supervisor of drinking on the job. (*See* Shah Decl. ¶ 35.) The third incident involved

---

[2] It is unclear from the record how this complaint was ultimately resolved.

3

plaintiff requesting to work from home on a particular day. The previous day, plaintiff had briefly left work because, she said, her daughter had "car trouble." On the day in question, plaintiff requested to work from home to care for her daughter had been in a "car accident" on the previous day. According to the performance review, when her supervisor asked whether plaintiff's daughter had "car trouble" or been in a "car accident," plaintiff accused her supervisor of discriminating against her, having poor management skills, and retaliating against her because of her New York Human Rights Law complaint. (*See id*.; *see also* Gefter Decl. ¶ 8.) The Interim Performance Review closed by stating that further accusations and threats would "be grounds for immediate termination from employment." (Gefter Decl. Ex 1.)

In 2007, some of plaintiff's co-workers complained to their supervisors that plaintiff was using her work phone to engage in personal real estate transactions and that her use of the phone for personal reasons was a distraction. (Def.'s 56.1 ¶¶ 54-58.)

On July 12, 2007, two events occurred that are central to the pending motions. First, that morning, plaintiff met with her supervisor Stephen Domjan and told him that she needed a short medical leave because of her ulnar neuropathy. (*Id.* ¶ 59.) Domjan told plaintiff that he would speak to management about it and get back to her. (*Id.* ¶ 61.) Domjan was the only Eclipsys employee with whom plaintiff discussed her leave request. (*Id.* ¶ 60; Pl.'s Second Dep. 121:10-22.)

The second chain of events began when Domjan observed plaintiff walking down the hall carrying a telephone. Plaintiff stopped Domjan in the hallway and told him that she had taken the telephone from the desk of a co-worker who was leaving the company. (*Id.* ¶ 62.) Domjan asked plaintiff who had given her permission to take the telephone from the co-worker's desk. (*Id.* ¶ 63.) Plaintiff replied that a secretary had, and Domjan told her that the secretary was not responsible for the distribution of the office telephones. (*Id.* ¶¶ 64-66.) Ultimately, Domjan told plaintiff that she could keep the phone. (*Id.* ¶ 68.)

Plaintiff then went to the office of Tina Christopher, another Eclipsys supervisor. (*Id.* ¶ 78.) Christopher states that, "in a confusing and hostile manner," plaintiff told her that Domjan was not letting her use a telephone with a display screen and embarrassed her by confronting her in the hallway. (Christopher Decl. ¶ 3.) After her encounter with plaintiff, Christopher went to Robert Gefter's office to discuss her meeting with plaintiff. Gefter was also a supervisor at Eclipsys. (*See id*. ¶ 4; Gefter Decl. ¶ 2.)

According to defendant, while Gefter and Christopher were meeting, they overheard plaintiff go to Domjan's office, which was adjacent to Gefter's office. (Def.'s 56.1 ¶ 75.) According to Domjan, Christopher, and Gefter, plaintiff became "irate" and stated that, going forward, she would only work on a quarter of the work requests that came into her department, not half as she had previously been assigned. (*Id.* ¶¶ 71-72, 75; Christopher Decl. ¶ 4.) Plaintiff appears to deny that this conversation ever took place. (Pl.'s Third Dep. 45:20-46:6.)

After his encounter with plaintiff, Domjan then wrote an e-mail to Gefter detailing the incident. (Domjan Decl. Ex. 6.) Gefter forwarded Domjan's e-mail to Jennifer Currao, a partner in Eclipsys's Human

4

Resources Department. In forwarding the e-mail, Gefter noted that Domjan was "very upset" by the incident and that he, Gefter, "would like to move forward with some action." (*See* Gefter Decl. Ex. 5.) The next day, Christopher also wrote an e-mail to Currao describing what she had overheard and stating that, in interacting with Domjan, plaintiff "was belligerent and out of control" and "bordering on being violent." (Christopher Decl. Ex. 1; Def.'s 56.1 ¶ 83.)

After receiving the e-mails from Domjan, Gefter, and Christopher, Currao contacted Ellen Miller, Eclipsys's Vice President of Human Resources. (Def.'s 56.1 ¶ 84.) In an e-mail to Miller in which she forwarded Gefter's and Domjan's e-mails, Currao asked Miller "Can we terminate her for this? Please say yes." (Pl.'s Ex. 19.) It was decided that plaintiff should be suspended without pay and that Currao should begin an investigation. (Def's 56.1 ¶ 85.)

Miller eventually reviewed the e-mails sent by Domjan, Gefter, and Christopher. (Miller Decl. ¶¶ 7-8.) Miller was also familiar "with [plaintiff's] ongoing job performance and workplace behavior issues," including the fact that plaintiff had been told during her 2006 review that further incidents of insubordination or inappropriate behavior would result in termination. (*Id*. ¶ 7.) After reviewing the e-mails regarding the July 12, 2007 incident and plaintiff's previous performance reviews, Miller decided to terminate plaintiff "based on her history of loudly disruptive and insubordinate behavior." (*Id*. ¶ 8.) Miller states that she was unaware that plaintiff had requested a medical leave of absence on July 12, 2007. (*Id*. ¶ 9.) Eclipsys fired plaintiff on July 17, 2007. (Def's 56.1 ¶ 89.)

2. Procedural History

Plaintiff filed the complaint in this action on June 19, 2008, initially proceeding *pro se*. The start of discovery was delayed several times while plaintiff sought to obtain counsel. Plaintiff obtained counsel in April 2009 and then filed an amended complaint four months later. At the close of discovery, defendant requested to file a motion for summary judgment and also sought to move for sanctions because plaintiff had allegedly produced a fabricated e-mail during discovery. The Court held a pre-motion conference on January 25, 2010. Both motions were fully submitted on April 26, and the Court held oral argument on June 29.

B. Standard of Review

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Reiseck v. Universal Commc'ns of Miami, Inc.*, 591 F.3d 101, 104 (2d Cir. 2010). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The Court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)

5

(summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (emphasis in original)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

The Second Circuit has provided additional guidance regarding summary judgment motions in discrimination cases:

> We have sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. *See, e.g.*, *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994). Nonetheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

*Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001)).

### C. Discussion

Plaintiff brings two claims against Eclipsys. First, she asserts that Eclipsys violated the Americans with Disabilities Act by discriminating against her on the basis of a disability. Second, she argues that defendant violated the Family and Medical Leave Act by firing her in retaliation for her FMLA leave request. As set forth below, neither of these claims can survive summary judgment.

#### 1. ADA

The ADA prohibits discrimination against

a "qualified individual with a disability." 42 U.S.C. § 12112(a).³ Claims of employment discrimination under the ADA are evaluated under the three-part burden-shifting analysis set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). *See McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009). Therefore, "[a] plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the [adverse employment action]; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (citing *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program*, 198 F.3d 68, 72 (2d Cir. 1999)).

As set forth below, plaintiff's ADA claim cannot survive summary judgment because, even examining the evidence in the light most favorable to plaintiff, no rational jury could conclude that she was disabled within the meaning of the ADA. Moreover, even assuming that she were disabled, no rational jury could find, given the undisputed evidence regarding problems with her job performance, that she was fired because of any disability.

a. The "Disability" Requirement

To establish a prima facie case for discriminatory discharge under the ADA, a plaintiff has the burden to demonstrate that: "(1) the defendant is covered by the ADA; (2) plaintiff suffers from or is regarded as suffering from a disability within the meaning

---

³ Congress recently enacted the ADA Amendments Act of 2008 ("ADAAA"), effective January 1, 2009, which expanded the class of individuals entitled to protection under the ADA. However, this Court and other courts—including the Second Circuit at least three summary orders—have indicated that the ADAAA does not apply to conduct that occurred prior to the effective date of the statute. *See, e.g., Ragusa v. Malverne Union Free Sch. Dist.*, No. 08-5367-2010 WL 2490966, at *1 n.2 (2d Cir. June 21, 2010) (summary order) ("[W]e here apply the version of the [ADA] in effect during the time period at issue, which ended with [plaintiff's] termination on June 30, 2005."); *Rogers v. City of N.Y.*, 359 F. App'x 201, 203 n.1 (2d Cir. 2009); *Cody v. County of Nassau*, 345 F. App'x 717, 720 (2d Cir. 2009) (summary order) ("[I]t is unlikely that the ADA Amendments Act of 2008 . . . applies to conduct that occurred before the Act's effective date of January 1, 2009. We need not decide the retroactivity issue . . . ."); *Schroeder v. Suffolk County Cmty. Coll.*, No. 07-CV-2060 (JFB) (WDW), 2009 WL 1748869, at *6 (E.D.N.Y. June 22, 2009) (collecting cases); *see also White v. Sears, Roebuck & Co.*, No. 07 Civ. 4286 (NGG) (MDG), 2009 WL 1140434, at *5 (E.D.N.Y. Apr. 27, 2009) ("The court therefore . . . concludes that the [ADAAA] should not apply to this case. This is consistent with the conclusions of other courts in this circuit that the 2008 Amendments do not apply to conduct prior to the effective date of the amended statute." (collecting cases)); *Moran v. Premier Educ. Group, LP*, 599 F. Supp. 2d 263, 271-72 (D. Conn. 2009) ("[I]t appears that every court that has addressed this issue, which includes a number of federal district courts and at least one federal appeals court, has concluded that the 2008 Amendments cannot be applied retroactively to conduct that preceded its effective date." (collecting cases)). Thus, the Court will evaluate plaintiff's evidence within the legal framework in

place at the time of plaintiff's termination, July 17, 2007, and not under the ADAAA.

of the ADA; (3) plaintiff was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of his disability or perceived disability.'" *Kinneary v. City of N.Y.*, 601 F.3d 151, 155-56 (2d Cir. 2010) (quoting *Capobianco v. City of N.Y.*, 422 F.3d 47, 56 (2d. Cir. 2005)).

In this case, with respect to the first element, defendant argues that plaintiff cannot establish that she is an "individual with a disability" under the ADA. As set forth below, the Court agrees.

### (1) Applicable Standard

The ADA defines "disability" as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).[4]

"In determining whether an individual has a disability for purposes of the ADA," the Second Circuit has "applied the three-step approach taken by the Supreme Court in *Bragdon v. Abbott*, 524 U.S. 624 (1998)." *Weixel v. Board of Educ. of City of N.Y.*, 287 F.3d 138, 147 (2d Cir. 2002). Under this approach,

plaintiff must first show that she suffers from a physical or mental impairment. Second, plaintiff must identify the activity claimed to be impaired and establish that it constitutes a "major life activity." Third, the plaintiff must show that her impairment "substantially limits" the major life activity previously identified. In addition, the Supreme Court has recently clarified that the identified major life activity must be "of central importance to daily life." *Toyota Motor Mfg. v. Williams*, 534 U.S. 184 (2002).

*Weixel*, 287 F.3d at 147 (internal citations omitted). The term "major life activity" includes "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). This, however, is not an exclusive list, and the Second Circuit has also included "'sitting, standing, lifting, and reaching'" as major life activities. *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 870 (2d Cir. 1998) (quoting U.S. Equal Employment Opportunity Commission, *Americans with Disabilities Act Handbook*, I-27 (1992)).[5]

Determining whether or not someone is disabled within the meaning of the statute requires "an individualized, fact-specific analysis." *Worthington v. City of New Haven*,

---

[4] Under the ADAAA, "disability" is now defined at 42 U.S.C. § 12102(1).

[5] The ADAAA codifies all of these activities, except sitting and reaching, as "major life activities." Additionally, the ADAAA includes concentrating, reading, bending, eating, sleeping, thinking, communicating, and "major bodily functions" as major life activities. *See* 42 U.S.C. § 12102(2) (as amended Jan. 1, 2009).

8

No. 3:94 Civ. 00609 (EBB), 1999 WL 958627, at *8 (D. Conn. Oct. 5, 1999).

(2) Application

Here, plaintiff has not shown she is substantially limited in any particular major life activity. As a threshold matter, the amended complaint does not allege any particular life activity in which plaintiff is limited. Additionally, plaintiff's memorandum of law in opposition to summary judgment simply states that her "ulnar neuropathy" "significantly impaired Plaintiff's ability to perform manual tasks" including "repetitive movements on a computer." (Pl.'s Opp. Mem. of Law at 15.) It does not, however, provide any cites to the record for this assertion. *Cf. Caruso v. Camilleri*, No. 04-CV-167A, 2008 WL 170321, at *17 (W.D.N.Y. Jan. 15, 2008) (recommending dismissal of ADA claim because "the record is devoid of admissible evidence from which a reasonable trier of fact could find that Plaintiff's ability to work was substantially limited within the meaning of the ADA"); *Jackson v. Nor Loch Manor Healthcare Facility*, 297 F. Supp. 2d 633, 636 (W.D.N.Y. 2004) (granting summary judgment to employer on ADA claim where plaintiff "failed to submit any competent evidence that she had a physical impairment that substantially limited a major life activity"), *aff'd* 134 F. App'x 477 (2d Cir. 2005). In short, to survive summary judgment, plaintiff was required to produce evidence that her impairments substantially limited her in a major life activity. She has not done so.

Moreover, plaintiff's own testimony demonstrates that her ulnar neuropathy does not substantially limit her in any major life activity. At her second deposition, plaintiff acknowledged that, after she was treated for ulnar neuropathy, she had "no problem" working and was also able to do other tasks without limitation:

> [QUESTION:] But with the ulnar neuropathy and the treatment, you are able to continue working and groom yourself and take care of yourself?
>
> [ANSWER:] Yes. I did that when I was on disability for 2005. I got the treatment. I was able to work for a few years, no problem.
>
> [QUESTION:] And you were able to cook and take care of your daughter and drive?
>
> [ANSWER:] Yes, everything.
>
> [QUESTION:] Sleep, sit, and stand?
>
> [ANSWER:] Yes.

(Pl.'s Second Dep. 120:3-14.)[6]

Two things about this testimony show that plaintiff is not substantially limited in any

---

[6] In opposing summary judgment, plaintiff does not assert that she is disabled because of her rapid heartbeat or diabetes. (*See* Pl.'s Opp. Mem. of Law at 15.) Nevertheless, plaintiff's deposition testimony establishes that neither of these conditions substantially limited her in any major life activity. Plaintiff testified that she "really [doesn't] have any" symptoms of diabetes except when she "take[s] blood tests" and that, despite her rapid heartbeat, she is able to sleep, sit, stand, walk, take care of herself, remember things, think, do household chores, and work. (*See* Pl.'s Second Dep. 114:13-115:21.)

9

major life activity. First, because medical treatment allowed plaintiff to live and work without any significant limitation, she cannot be considered disabled under the version of the ADA in effect at the time of her termination. *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482 (1999) ("A 'disability' exists only where an impairment 'substantially limits' a major life activity, not where it 'might,' 'could,' or 'would' be substantially limiting if mitigating measures were not taken. A person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently 'substantially limits' a major life activity."); *Fall v. N.Y. State United Teachers*, 289 F. App'x 419, 421 n.3 (2d Cir. 2008) (finding plaintiff not substantially limited in any major life activity where, *inter alia*, plaintiff "admit[ted] that when she is wearing her hearing aids, her hearing is corrected"); *Teachout v. N.Y. City Dep't of Educ.*, No. 04 Civ. 945(GEL), 2006 WL 452022, at *4 (S.D.N.Y. Feb. 22, 2006) ("[A]n individual who has an impairment, but who is able to virtually eliminate the effects of that impairment through medication, is not considered 'disabled' under the ADA because his impairment does not substantially limit any of his life activities, thanks to the medication.").

Second, plaintiff's testimony indicates that she did not experience symptoms of ulnar neuropathy (or her other ailments) for long periods of time. A plaintiff will not be "substantially limited" in a major life activity if the impairment in question causes only episodic or temporary restrictions. *See Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 871-72 (2d Cir. 1998) (holding episodic colitis attacks did not substantially limit plaintiff in any major life activity); *Tojzan v. N.Y. Presbyterian Hosp.*, No. 00 Civ. 6105(WHP), 2003 WL 1738993, at *8 (S.D.N.Y. Mar. 31, 2003) ("Since [plaintiff's] physical impairments are episodic and are not consistently severe, they do not substantially limit a major life activity. Thus, [plaintiff] is not disabled within the meaning of the ADA and consequently cannot establish a *prima facie* case of disability discrimination."); *Irby v. N.Y. City Transit Auth.*, No. 99 CIV. 2172(VM), 2000 WL 1634413, at *2 (S.D.N.Y. Oct. 30, 2000) (finding plaintiff who alleged that polycystic kidney and polycystic liver disease caused her to miss work because of diarrhea and fatigue at least two to three days each month during her menstrual cycle was not substantially limited in any major life activity because condition was limited in severity, duration, and impact) *aff'd* 262 F.3d 412 (2d Cir. 2001).[7] In sum, plaintiff cannot establish a prima facie case of disability discrimination because she has submitted no evidence from which a jury could find she is substantially limited in any major life activity, and, moreover, her own testimony establishes that her impairments do not in fact limit her in any major life activity.

---

[7] Although plaintiff states that she was placed on "modified light duty" at one point and cites to a transcript of a "Dr. Krisha," the record contains no such transcript. In any event, the simple fact that plaintiff was placed on light duty does not, standing alone, provide a basis for a trier of fact to conclude that plaintiff is substantially limited in any major life activity. *See Colwell v. Suffolk County Police Dep't.*, 158 F.3d 636, 644-45 (2d Cir. 1998) (finding that police officers assigned to light duty were not substantially limited in any major life activity); *accord Lytes v. D.C. Water & Sewer Auth.*, 527 F. Supp. 2d 52, 61 (D.D.C. 2007) ("Restrictions to sedentary or light duty are insufficient to substantially limit [plaintiff] in a major life activity as the ADA has been interpreted and applied.").

### b. Evidence of Discrimination

Even assuming *arguendo* that plaintiff could establish a prima facie case, her ADA claim could still not survive summary judgment because defendant has articulated a non-discriminatory reason for the termination, and, as discussed below, no rational jury could conclude that the reason given by defendant was a pretext for discrimination.

### (1) Applicable Law

Under the *McDonnell-Douglas* burden-shifting formula, if the plaintiff establishes a prima facie case, the burden shifts to the defendant to "'articulate some legitimate, nondiscriminatory reason'" for the adverse employment action. *Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004) (quoting *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311 (1996)). If the defendant carries that burden, "the burden shifts back to the plaintiff to demonstrate by competent evidence that 'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Patterson*, 375 F.3d at 221 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

To meet this burden, the plaintiff may rely on evidence presented to establish her prima facie case, as well as additional evidence. Such additional evidence may include direct or circumstantial evidence of discrimination. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-101 (2003). It is not sufficient, however, for a plaintiff merely to show that she satisfies "*McDonnell Douglas*'s minimal requirements of a prima facie case" and to put forward "evidence from which a fact finder could find that the employer's explanation . . . was false." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000). Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue—whether the record contains sufficient evidence to support an inference of discrimination. *See id.*

### (2) Application

Here, there is no such evidence. Eclipsys contends that it fired plaintiff because of several incidents of insubordinate behavior culminating in the July 12, 2007 encounter with Domjan. Insubordinate behavior is a permissible and legitimate, non-discriminatory reason for firing an employee. *See, e.g.*, *Tebbenhoff v. Elec. Data Sys. Corp.*, 244 F. App'x 382, 384 (2d Cir. 2007) (noting that "defendants have proffered a nondiscriminatory justification for [plaintiff's] discharge, namely, employee insubordination"); *Peterson v. City of Rochester*, No. 06-CV-6003, 2010 WL 1408013, at *9 (W.D.N.Y. Mar. 31, 2010) ("I find that the City has satisfied its burden of providing a legitimate, non-discriminatory reason (insubordination) for plaintiff's termination."); *McCowan v. HSBC Bank USA, N.A.*, 689 F. Supp. 2d 390, 409 (E.D.N.Y. 2010) ("Insubordination and other conduct that disrupts a workplace are legitimate reasons to terminate an employee." (citing *Matima v. Celli*, 228 F.3d 68, 79 (2d Cir. 2000))). Additionally, plaintiff does not dispute that Eclipsys's code of conduct prohibits insubordinate behavior.

As evidence that Eclipsys's proffered reason was pretext, plaintiff cites the e-mail from Currao, the human resources partner, to Miller, the Human Resources Vice President, in which Currao asks "[c]an we terminate

11

[plaintiff] for this? Please say yes." (*See* Pl.'s Ex. 19.) However, the "this" referred to by Currao is clearly plaintiff's allegedly insubordinate behavior towards Domjan. Currao is forwarding to Miller the e-mail sent by Gefter in which he categorizes plaintiff's behavior as a "verbal attack" and states that Domjan is "very upset." Also contained within Currao's e-mail is Domjan's description of the events of July 12, including a statement that plaintiff had become "very irate."

As such, the Currao e-mail actually supports defendant's argument that it fired plaintiff because of her insubordinate behavior towards Domjan—and not because it was discriminating against her because of an actual or perceived disability (or, as discussed *infra*, because she had requested FMLA leave).

To further support her argument that there is evidence of pretext, plaintiff attempts to undermine Eclipsys's assertion that she had a history of insubordinate and disruptive behavior. Specifically, plaintiff argues that some of her supervisors' statements in plaintiff's April and October 2005 performance evaluations—for example, a statement that plaintiff improperly shared confidential information—are untrue. (Pl.'s Opp. Mem. of Law at 16.) Plaintiff also appears to assert that some of the other incidents that, according to Eclipsys, showed a pattern of insubordinate behavior, were really instances of Eclipsys discriminating against her "because they resented her absences from work." (*Id.* at 17.) For example, she claims that Eclipsys discriminated against her by disciplining her when she complained that Eclipsys should allow her to work from home. Additionally, she contends that Eclipsys discriminated against her because, when her co-workers complained about her use of her office phone for personal matters, Eclipsys simply disciplined plaintiff based on the complaints and did not first conduct an investigation. (*See id*.)

Plaintiff, however, provides no evidence that Eclipsys discriminated against her because she was disabled. Put another way, even assuming *arguendo* that Eclipsys treated plaintiff differently than other employees by, for example, not allowing her to work from home or not first conducting an investigation into allegations regarding her phone use, there is no evidence that Eclipsys did this because it intended to discriminate against plaintiff on the basis of an actual or perceived disability. *Cf. Leavenworth v. Potter*, Civil Action No. 3:07-cv-00960 (VLB), 2009 WL 378642, at *4 (D. Conn. Feb. 13, 2009) ("Neither the Court nor a rational jury may assume that employers are motivated by animus without evidence of such; employers may act irrationally or arbitrarily without any discriminatory motive.").[8] Therefore,

---

[8] Plaintiff also cites, as evidence of Eclipsys's discriminatory intent, the fact that Evelyn Franklin, one of her supervisors, inquired about firing plaintiff after plaintiff's return from her disability leave in 2006. (Shah Decl. ¶ 34.) The supervisor's inquiry does not, however, help the plaintiff survive summary judgment. The circumstances giving rise to the disability leave in question are undisputed—plaintiff experienced a rapid heartbeat upon reading her October 2005 evaluation, and Eclipsys subsequently granted her six weeks' leave. According to the e-mail cited by plaintiff, when plaintiff returned from leave, she continued to refuse to discuss the performance evaluation with her superiors, stating she was "not physically ready to discuss the performance evaluation" and that her doctor had told her "to stay away from strenuous activities." (Pl.'s Ex. 14.) In response to plaintiff's e-mail, Franklin

plaintiff's disagreements with the way Eclipsys handled these incidents cannot help her ADA claim survive summary judgment.

Nor is there evidence of discriminatory intent with respect to events surrounding plaintiff's actual termination. At her deposition, plaintiff appeared that the July 12, 2007 encounter in Domjan's office ever took place. (Pl.'s Third Dep. 45:20-46:6.) Plaintiff presents no evidence, however, that Miller—who ultimately decided to fire plaintiff—did not honestly believe that plaintiff had been insubordinate towards Domjan. To be a valid legitimate, non-discriminatory reason for termination, an employer's belief need not be correct, only honestly held. *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598 (6th Cir. 2007) ( "[The employee's] disagreement with the facts uncovered in [the employer's] investigation does not create a genuine issue of material fact that would defeat summary judgment as long as an employer has an honest belief in its proffered nondiscriminatory reason." (internal quotation marks omitted)); *Jones v. Union Pac. R.R.*, 302 F.3d 735, 744 (7th Cir. 2002) (affirming summary judgment in employer's favor on discrimination claim arising from dismissal of plaintiff following a quarrel with another employee and noting the following: "[Plaintiff] asserts that he was not insubordinate or quarrelsome with [another employee] . . . . While we do accept his version of the facts as true, the actual issue is not whether [the defendant's] account of events is correct, rather it is whether [the defendant] honestly believed the report of its officers."); *Jeunes v. Potter*, CIV. NO. 3:08CV1218 (HBF), 2009 WL 2883060, at *9-10 (D. Conn. Sept. 3, 2009) ("'In determining whether a plaintiff has produced sufficient evidence of pretext, the key question is not whether the stated basis for termination actually occurred, but whether the defendant believed it to have occurred . . . .'" (quoting *Macoas Soto v. Core-Mark Int'l., Inc.*, 521 F.3d 837, 842 (8th Cir. 2008))); *Warren v. N. Shore Univ. Hosp. at Forest Hills*, Civil Action No. CV-03-0019 (DGT)(RML), 2006 WL 2844259, at *9 (E.D.N.Y. Sept. 29, 2006) ("An inaccurate, but honestly held belief about an employee does not establish a claim of pretext."). As such, because there is no evidence that Miller did not honestly believe that plaintiff had engaged in the activity complained of by Gefter, Domjan, and Christopher, no reasonable jury could find that defendant intentionally discriminated against plaintiff on the basis of disability.

---

forwarded the e-mail to another Eclipsys employee and asked about the possibility of terminating plaintiff for "performance and behavioral reasons." (*See id*.) In a later e-mail, Franklin complained to another Eclipsys employee about "los[ing] productivity" because plaintiff had told her that she had to leave work to see a doctor about whether she could attend a session to discuss the performance review. (Pl.'s Ex. 15.) These e-mails do not create an issue of fact as to Eclipsys's intent in terminating plaintiff. As a threshold matter, there is no evidence Franklin had any role in plaintiff's July 2007 termination. Thus, the relationship between Franklin's comments—made 18 months before plaintiff was actually terminated—and plaintiff's termination, is at best, extremely attenuated. Additionally, even viewing the e-mails in a light most favorable to plaintiff, there is no evidence Franklin wanted to terminate plaintiff because of an actual or perceived disability, and not because, as she stated in her e-mail, plaintiff was "not effective as a team member, [had] demonstrated repeated unprofessional behavior, is a distraction to the team[,] and I cannot confidently assign any critical work to her." (Pl.'s Ex. 14.)

13

In sum, defendant has proffered a legitimate, non-discriminatory reason for plaintiff's termination, and, even assuming plaintiff is disabled under the ADA, plaintiff has produced no evidence from which a trier of fact could find that defendant's proffered reason is merely pretext. Thus, because plaintiff can neither (1) demonstrate that she is disabled nor (2) demonstrate pretext, defendants are entitled to summary judgment on her ADA claim.

### 2. FMLA

The FMLA gives eligible employees an "entitlement" to twelve weeks of unpaid leave each year based on "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D); *see also Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 174 (2d Cir. 2006). An employer can violate the FMLA by retaliating against an employee because the employee exercised her FMLA rights. *See Potenza v. City of N.Y.*, 365 F.3d 165, 167-68 (2d Cir. 2004).

As with plaintiff's ADA claim, the burden-shifting approach originally set out by the Supreme Court in *McDonnell-Douglas v. Green*, 411 U.S. 792 (1973), applies to her FMLA retaliation claim. *Id*. at 168. Thus, to state a prima facie case of FMLA retaliation, the plaintiff must show that (1) she exercised rights protected under the FMLA; (2) she was qualified for her job; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent. *Id*. If the plaintiff establishes a prima facie case, then the burden of production shifts to the employer to demonstrate a legitimate, non-discriminatory reason for the adverse employment action. *Di Giovanna v. Beth Israel Med. Ctr.*, 651 F. Supp. 2d 193, 203 (S.D.N.Y. 2009). If the employer meets its burden of production, then the plaintiff must establish that the employer's proffered reason was merely a pretext for a discriminatory reason. *See id*. at 203-04.

Here, Eclipsys argues that plaintiff cannot establish the "inference of retaliatory intent" element of the prima facie case. To support its argument, defendant asserts that Miller, the employee who decided to terminate plaintiff, did not know that plaintiff had requested FMLA leave. However, the Court will assume *arguendo* plaintiff can establish a prima facie case, particularly because she was terminated only five days after she requested FMLA leave. *Cf. id*. at 204 ("[Plaintiff's] evidence in support of a *prima facie* case is at best anemic. However, his burden at this first step is minimal, and the short time interval between his filing for FMLA leave and his termination may be sufficient to satisfy it. But the Court will assume, without deciding, that plaintiff has established a *prima facie* case, thus making it unnecessary to decide the issue." (citations omitted)).[9]

As discussed in connection with plaintiff's ADA claim, defendant has proffered a legitimate, non-discriminatory reason for plaintiff's termination—her insubordination. Thus, the Court will proceed to the ultimate question of whether plaintiff has produced evidence from which a jury could rationally

---

[9] As discussed *infra*, defendant has moved for sanctions because it argues that plaintiff committed fraud on the court by fabricating an e-mail that purports to be a request for FMLA leave. Regardless of the authenticity of that e-mail, however, it is undisputed that plaintiff also requested FMLA leave from Stephen Domjan in person. (Def.'s 56.1 ¶ 59.)

14

find that Eclipsys fired her in retaliation for her taking FMLA leave.

There is no evidence of retaliatory intent here. Simply put, plaintiff has produced no evidence to rebut defendant's assertion that plaintiff was fired because Miller believed plaintiff had been insubordinate and disruptive on July 12, 2007 and on previous occasions. Moreover, there is no evidence Miller even knew that plaintiff had requested FMLA leave. The fact that the relevant decision maker was unaware that plaintiff had requested FMLA leave undercuts any argument that retaliatory intent was behind the decision to fire plaintiff. *See Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 800 (11th Cir. 2000) ("Because the evidence is unrefuted that Nelson, the decision maker, did not know [plaintiff] had requested and been scheduled for medical leave, [plaintiff] failed to create a genuine issue of fact as to a causal connection between her termination and her scheduled leave or her request for it. Accordingly, she failed to establish a prima facie case of retaliation under the FMLA, and the district court correctly granted summary judgment to BellSouth on this claim."); *Camp v. Centrue Fin. Corp.*, No. 08 C 4020, 2010 WL 1333811, at *4 (N.D. Ill. Mar. 31, 2010) ("But whether [defendant] as an entity was on notice of [plaintiff's] FMLA leave request is not determinative. The relevant question is whether there is evidence from which a jury could infer that . . . the undisputed decisionmaker, learned of [plaintiff's] FMLA request prior to the date on which he made his decision to terminate [plaintiff]."); *Farmer v. Bisk Educ., Inc.*, No. 8:08-cv-00239-JDW-EAJ, 2009 WL 2246137, at *1 (M.D. Fla. July 27, 2009) ("Notwithstanding the close temporal proximity between her termination and her request for FMLA leave, the undisputed facts establish that the corporate decision-makers who terminated [plaintiff] did not know that she had requested FMLA leave when they terminated her . . . ."). And, although Domjan knew about plaintiff's leave request, there is also no evidence that Domjan played any role in deciding, or even recommending, that plaintiff be terminated. Finally, the fact that Eclipsys had twice previously granted plaintiff medical leave is further evidence that it did not have any retaliatory animus towards plaintiff. *Coleman v. Prudential Relocation*, 975 F. Supp. 234, 246 (W.D.N.Y. 1997) (granting summary judgment to employer on FMLA retaliation claim where, *inter alia*, "the record is simply devoid of evidence that anyone at Prudential ever tried to make it difficult for [plaintiff] to take medical leave"); *see also Fall v. N.Y. State United Teachers*, 289 F. App'x 419, 422, (2d Cir. 2008) ("Moreover, [defendant] was aware of and accommodated [plaintiff's] claimed hearing impairment from the onset of her employment, a fact that militates against a later finding of discrimination.").[10] In short, plaintiff has

---

[10] Furthermore, to the extent plaintiff relies on the e-mails from Evelyn Franklin (discussed *supra* note 8) as evidence of retaliatory intent, the Court rejects that argument. First, as discussed above, there is no evidence Franklin played any role in plaintiff's eventual firing. As such, even assuming *arguendo* that Franklin bore retaliatory animus, there is no basis for imputing that animus to the employees involved in plaintiff's 2007 termination, which occurred 18 months after Franklin's e-mails. Similarly, the fact that Franklin told plaintiff she should consider resigning before plaintiff's first FMLA leave does not establish an issue of fact on the instant motion. First, despite Franklin's comment, Eclipsys granted plaintiff FMLA leave on that occasion and on another occasion less than six months later. Second, plaintiff's termination occurred over two years after Franklin's comment.

15

produced no evidence from which a jury could find that it was retaliatory intent—and not an honestly held belief that plaintiff had repeatedly been insubordinate—that caused Eclipsys to fire plaintiff.

In sum, plaintiff has produced no evidence from which a jury could rationally find that defendant discriminated against her (1) on the basis of disability or (2) in retaliation for her taking FMLA leave. As such, the Court grants defendant's motion for summary judgment in its entirety.

II. MOTION FOR SANCTIONS

Defendant has also moved for sanctions against plaintiff. The motion for sanctions relates to an e-mail produced by plaintiff twelve days before the close of discovery. The e-mail purports to be a request for medical leave sent by plaintiff to Stephen Domjan, her supervisor. Defendant contends the e-mail is a fraud.

A. Background

On October 14, 2009, plaintiff's counsel took the deposition of Robert Gefter, one of plaintiff's supervisors at Eclipsys. (Meyers Decl. ¶ 6.) During the deposition, plaintiff's counsel produced an e-mail purportedly sent on July 12, 2007 by plaintiff to her immediate supervisor during her employment with Eclipsys, Stephen Domjan ("the e-mail" or "the e-mail in question"). (*See id*. ¶¶ 6-7.) The subject line of the e-mail reads "Re: Request for Disability Leave." (*Id.* ¶ 8.) The body of the e-mail reads:

Steve, As per our conversation this morning in your office concerning my health condition, I just wanted to inform you in advance that I may need to take short term (approximately 2 to 3 weeks) disability leave. I will be able to give you more details of my disability leave after I get confirmation from my doctor. As you had stated this morning that you would be discussing this matter with Rob and HR and get back to me. Please let me know as soon as possible. Thx, Tina.[11]

It is undisputed that plaintiff had not produced the e-mail at any point before Gefter's deposition, even though discovery had been occurring for over six months, and plaintiff had produced almost 500 documents. (Meyers Decl. ¶¶ 4-5.) Defense counsel states that the belated disclosure of the e-mail raised his suspicions regarding its authenticity. (*See id*. ¶¶ 10, 13.) According to defense counsel, he asked Domjan if he ever received the e-mail, and Domjan stated he had not. (*Id.* ¶¶ 11-12.)

Following Gefter's deposition, the parties stipulated to an extension of the discovery period, and defense counsel undertook further investigation of the e-mail's pedigree. (*See id*. ¶¶ 14-15.) Specifically, defense counsel consulted with Carlos Gonzalez, Senior Director of Service Management and Information Services at Eclipsys, and Pat Dariezno, Director of Network and System Security for NSLIJ. (*Id.* ¶ 16.)

---

Third, again, there is no evidence Franklin was involved in the decision to fire plaintiff.

[11] It can be inferred from the record that, although plaintiff's given name is "Kalpana," she went by "Tina."

16

According to Gonzalez, NSLIJ operates an e-mail archive system called Extender. (Gonzalez Decl. ¶ 2.) According to Darienzo, the Extender system was in place on July 12, 2007 and would have saved any e-mails sent by Shah and received by Domjan. (Darienzo Decl. ¶¶ 3-4.)

In November 2009, one of Gonzalez's subordinates searched the Extender system for all e-mails sent and received by Shah on July 12, 2007, the date the e-mail was purportedly sent. (Gonzalez Decl. ¶ 3.) Gonzalez reviewed the search results and determined the e-mail was not sent from Shah's account. (*Id*. ¶ 4.) Eclipsys also ran a search of all e-mails sent and received by Domjan; none of these contained the e-mail purportedly sent by plaintiff. (*Id*. ¶¶ 6-7.) Furthermore, Eclipsys printed out every e-mail sent by plaintiff on July 12, 2007, and every one has a colon after the "To" line. (*Id*. ¶ 5.) Notably, the e-mail that plaintiff purportedly sent to Domjan does not have a colon after "To."

Plaintiff was also deposed for a third time. Defense counsel asked plaintiff to compare another e-mail sent from plaintiff's account on July 12, 2007 with the e-mail in question. Defendant's counsel noted that the e-mail purportedly sent to Domjan contained a disclaimer at the bottom while the e-mail retrieved from plaintiff's account did not. When asked why one e-mail contained a disclaimer and another did not, plaintiff stated

> First of all, I am not examiner, but I can just tell you this was printed by me. The e-mail of disability leave was printed by me, so it has my name . . . I don't know who printed this and how their setup is, so I have no clue why I don't see that. Maybe when you reply to some e-mail, you don't see it. I don't know why. This e-mail was a reply to [a departing employee's farewell e-mail.] My e-mail of congrats and good luck was a reply. This was not a reply. I can't tell you. I printed this at that time with my settings. I don't know — the one I'm talking to, request for disability, was printed by me. And it wasn't replied to any. That's the only difference I can tell you. I don't know who printed the good-bye one. So it depends on their settings, how their setup is. And also that's a reply . . . so that might [be] the reason. I have no idea.

(Pl.'s Third Dep. 41:18-42:15.)

B. Applicable Law

Eclipsys argues that sanctions are appropriate because the e-mail is fabricated and, therefore, plaintiff has committed a fraud on the court.

A district court has inherent power to sanction parties for litigation abuses, including fraud on the court. *See McMunn v. Mem'l Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 442 (S.D.N.Y. 2002) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991)). To find that a party has committed fraud on the court, it must be established by clear and convincing evidence that the party has repeatedly and intentionally lied "about issues that are central to the truth-finding process." *Passlogix, Inc. v. 2FA Tech., LLC*, - - - F. Supp. 2d - - -, No. 08 Civ. 10986 (PKL), 2010 WL 1702216, at *9 (S.D.N.Y. Apr. 27, 2010). As set forth below, the Court will require an evidentiary hearing before determining whether there is clear and convincing evidence that plaintiff has committed fraud on the court.

17

## C. Evidence of Fraud

Defendant argues that there is clear and convincing evidence that the e-mail is a fabrication because (1) the e-mail was not found during a search of the Extender system and (2) the e-mail differs in appearance from the other e-mails that Eclipsys found during the search. With respect to the second point, the e-mails retrieved by Eclipsys during the search all had a colon next to the "To" line, but, according to Eclipsys, none have a privacy disclaimer at the bottom of the page. (*See* Gonzalez Decl. ¶¶ 10-12.) Conversely, the e-mail in question does not have a colon following the "To" line and does have a disclaimer.

Plaintiff makes several arguments in response. First, plaintiff declares that the belated disclosure occurred because she failed to "maintain a proper filing system to organize all [her] documents." (Shah Decl. ¶ 22.) Plaintiff appears to contend that she discovered the e-mail when, after a flood in her basement, she moved her records from the basement to a first-floor room and "while going through this room, I came across the email from [sic][12] Stephen Domjan." (*Id.* ¶ 23-25.) Furthermore, plaintiff claims that she believed the e-mail had been produced and only realized it had not been produced until the "day before a scheduled deposition of Eclipsys employees . . . ." (*Id.* ¶ 25.) Second, plaintiff states that she believes that the missing colon next to the "To" line occurred "due to how the email was copied." (*Id.* ¶ 20.) Third, plaintiff attests that she added the privacy disclaimer to the e-mail when she sent it to Domjan because the e-mail "related to a request for disability leave." (*Id.* ¶ 18.) Plaintiff does not, however, attempt to explain why the e-mail did not turn up during Eclipsys's search of the Extender system. Instead, plaintiff seems to allege that Eclipsys failed to produce the e-mail. (*Id.* ¶ 32 ("Although a few emails were submitted in response to the discovery request, a vast majority of the emails were withheld, including the email sent to Stephen Domjan on July 12, 2007.").)

Given this record, the Court will require an evidentiary hearing before determining if there is clear and convincing evidence of fraud on the court. First, because plaintiff asserts that she sent the e-mail, there are credibility questions that are more appropriately resolved via live testimony than through affidavits and partial deposition transcripts. Second, the record contains no affidavit or declaration from Domjan, the e-mail's supposed recipient, regarding whether or not he received the e-mail. The record contains only a hearsay statement from Domjan that it is incorporated into the declaration of defendant's counsel. (*See* Meyers Decl. ¶¶ 11-12.) Additionally, a key part of the declaration of Carlos Gonzalez contains implied hearsay. Gonzalez states "one of my technicians ran a search of Extender. All the e-mails that were sent by Shah and received by Shah on July 12, 2007 are attached hereto as Exhibit 1." (Gonzalez Decl. ¶ 3.) Because Gonzalez himself did not run the search, this statement is essentially incorporating the technician's statement that all the e-mails in Exhibit 1 are in fact all of the e-mails sent and received by plaintiff on July 12, 2007. As such, Gonzalez's statement contains implied hearsay. Finally, defendant cites as evidence of fraud the fact that the e-mail in question contains a privacy disclaimer even though other e-mails sent internally at

---

[12] Of course, the e-mail in question was allegedly sent *to* Stephen Domjan.

18

Eclipsys do not. However, other, apparently internal e-mails in the record on both the sanctions motion and on motion for summary judgment do, in fact, contain a privacy disclaimer. (*See, e.g.*, Pl.'s Exs. 4, 10, 16; Domjan Decl. Ex. 6.) Thus, further development of the factual record is needed before the Court can determine whether there is clear and convincing evidence of fraud.

Given the need to resolve credibility and hearsay issues and the need for further development of the factual record, the Court concludes that an evidentiary hearing is necessary before it can find clear and convincing evidence of fraud on the court. Although an evidentiary hearing is not always necessary before finding a party has committed fraud on the court, many courts in this circuit and elsewhere have exercised their discretion to hold evidentiary hearings before imposing sanctions on that basis. *See, e.g.*, *Passalogix*, 2010 WL 1702216, at *1 (noting the court held "a five -day evidentiary hearing on the issues of fraud on the court and spoliation of evidence"); *Jung v. Nechis*, No. 01 Civ. 6993(RMB) (THK), 2009 WL 762835, at *3 (S.D.N.Y. Mar. 23, 2009) (noting that court held two-day evidentiary hearing regarding defendants' motion for sanctions based on alleged fraud on the court); *E. Fin. Corp. v. JSC Alchevsk Iron & Steel Works*, 258 F.R.D. 76, 78 (S.D.N.Y. 2008) (noting the court held a three-day evidentiary hearing regarding allegation that party had committed fraud on the court); *Cerruti 1881 S.A. v. Cerruti, Inc.*, 169 F.R.D. 573, 578-82 (S.D.N.Y. 1996) (recounting witness testimony at two hearings that court held before determining that party had committed fraud on the court); *accord Greenburg v. Roberts Props. Ltd.*, No. CV04-0001-PHX-SRB, 2005 WL 3536114, at *3 (D. Ariz. Decl. 22, 2005) ("The Court concludes that the best way to resolve the issue of Plaintiffs' alleged fraud is to conduct an evidentiary hearing."); *Sun World, Inc. v. Lizarazu Olivarria*, 144 F.R.D. 384, 385 (E.D. Cal. 1992).

Accordingly, the Court will reserve decision on the motion for sanctions pending an evidentiary hearing.

### III. CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is granted in its entirety. The Court reserves decision on defendant's motion for sanctions pending an evidentiary hearing. The parties shall participate in a telephone conference for the purpose of scheduling the hearing on Tuesday, July 13, 2010 at 11:30 a.m. At that time, counsel for defendant shall initiate the call and, once all parties are on the line, contact Chambers at (631) 712 5670.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: July 7, 2010
Central Islip, New York

\* \* \*

Plaintiff is represented by Michele Baptiste, 100 Ring Road, Suite 214, Garden City, NY 11530. Defendant is represented by John Meyers and Maile Gilmore, Seyfarth Shaw, LLP, 1075 Peachtree St. NE, Suite 2500, Atlanta, GA 30309.